**FLEMING, Adm'r of Wage and Hour Division, Department of Labor, v. NATIONAL BANK OF COMMERCE OF CHARLESTON.**

No. 128.

District Court, S. D. West Virginia.

Nov. 17, 1941.

Beverley R. Worrell, James P. Hart, Jr., and Bennett H. Barnes, all of Richmond, Va., and Gerard D. Reilly, Irving J. Levy, and Charles R. Reynolds, Jr., all of Washington, D. C., for plaintiff.

Silverstein, Davis & Rich and Kay, Casto & Amos, all of Charleston, W. Va., for defendant.

MOORE, District Judge.

This is an action brought by the plaintiff against the defendant for a preliminary and permanent injunction to restrain alleged violations of certain provisions of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

The particular sections of the Act which plaintiff asks the Court to enjoin the defendant from violating are § 15(a) (2) and § 15(a) (5), which correspond to Title 29 U.S.C.A. § 215(a) (2) and (a) (5). It is alleged that the defendant has continuously worked its employees overtime without payment of the statutory compensation for overtime work and that during the entire period since the Fair Labor Standards Act of 1938 went into effect it has kept inaccurate records so that it could not be determined from the records what was the true situation with reference to this overtime work. Plaintiff contends that he is entitled to an injunction against violations of the Act in the future, in order that his rights and the obligations of the defendant be judicially determined, and because there is no assurance otherwise that the defendant will not continue its violations. Defendant admits violations of the Act in the past, though not to the

full extent which the testimony adduced by the plaintiff indicates, but avers that the violations were inadvertent and without the knowledge of defendant's officers; that payments for overtime work were made when the discrepancies were called to its attention; that its inaccurate methods of keeping records were satisfactorily corrected prior to the filing of the complaint; and that its intentions are to comply with the Act in the future in every respect.

The defendant is a national banking institution which has been engaged in business as such for many years in the city of Charleston, West Virginia. At the time the Fair Labor Standards Act became effective in October, 1938, defendant had a force of employees, including officers, numbering twenty-one. A year later this force had been increased to twenty-three; and in October, 1940, there were twenty-seven employees and officers.

As was the practice in similar institutions, the defendant bank in its relations with its employees had not, prior to October, 1938, established any standards with reference to the number of hours to be spent by each employee at his work. They were hired upon a monthly salary and were permitted to come and go virtually at their own pleasure, the only requirement being that they produce satisfactory results in the respective positions in which they were employed. They were variously classified as tellers, individual bookkeepers, general bookkeepers, runners, note tellers, secretaries or stenographers and general utility workers.

When the Fair Labor Standards Act was about to go into effect in October, 1938, the officers of the bank sought to determine whether or not its provisions were applicable to the employees of a national bank. Defendant's president, J. E. McDavid, submitted the question to the bank's counsel and was advised that in the opinion of counsel, the Act did not apply to the defendant's employees. However, a few days prior to the effective date of the Act, McDavid called a meeting of the employees, at which meeting he stated to the employees that although he was not sure whether or not the Act was applicable to national banks, yet in order to be on the safe side, the defendant would endeavor to observe the law by keeping a record of the time worked. He further said to the employees that the defendant's Board of Directors felt that they should not pay for overtime work, and told the employees that when they had worked the maximum of forty-four hours in any week, they should report to an officer of the bank for further instructions or should quit work and go home. A system of cards for recording the hours worked each day by each employee was installed, and each employee was made responsible for keeping his own time on these cards. At the subsequent yearly intervals in October, 1939, and October, 1940, when the maximum weekly hours were decreased by the provisions of the Act to forty-two and forty hours, respectively, McDavid gave similar instructions to the employees relative to the newly effective maximum hours.

It appears that many of the employees received the impression from McDavid's statements to the group of employees that it was the wish of the officers of the bank that the employees should not record on their time cards more than the statutory maximum working hours in each week, regardless of the time actually worked. I can discover no basis for this idea on the part of the employees, but the testimony leaves no doubt that such an impression did prevail. Consequently, although many of the employees thereafter continuously and consistently worked more than the maximum hours, they failed to record the actual time worked, except in relatively few instances, and instead they recorded merely the number of hours required to produce the maximum for each week. Also, due to the nature of their work, many of them were unable to determine definitely the actual time spent on the bank's work as distinguished from time spent in their personal affairs during the day, some of which time was spent outside the bank.

It is not shown that any of the officers of the bank, prior to the hearing held herein on May 6, 1941, knew that any of the employees were deliberately recording their hours of work incorrectly.

In September, 1940, an inspector for the Wage and Hour Division of the United States Department of Labor visited the defendant bank for the purpose of making an inspection of labor conditions and practices there. Presumably it was on that occasion that the inspector procured from various employees of the defendant the information which was the basis of the complaint in this action and which was later developed in the testimony of witnesses at the hearing in court. However, the inspector did not at that time inform

the officers of the bank of any irregularities. Defendant's auditor furnished the inspector with all records and information requested by him and asked the inspector for advice as to any particular matter in which the bank might be violating the Fair Labor Standards Act, so that it might be corrected immediately. The inspector made no criticism, but on the contrary complimented the system of records in use by the bank, saying it was a very good system.

In the month of October, 1940, more than a month before this action was instituted by the administrator, a time clock was installed in defendant's bank by which the working hours of every employee were recorded accurately and exactly. It does not appear from the testimony why the time clock was installed, but it is shown that the reason why the time clock was not used from the beginning of the operation of the Fair Labor Standards Act was that the employees of defendant, being salaried employees working in what is described by the president as a sort of "family" relationship, disliked the idea of working under a time clock. Since the installation of the time clock all overtime has been paid for in accordance with the applicable provisions of law.

On November 28, 1940, plaintiff filed his complaint in this action. Subsequently the defendant caused an audit to be made, which disclosed that according to the time cards as kept by the employees there was a total of $85.50 due them collectively for the overtime which they had entered on their time cards. This audit being questioned by the inspector for the Wage and Hour Division, the defendant caused a second audit to be made by a different auditor, who reported approximately $50 additional as being due to various employees. These amounts were promptly paid by the defendant to those entitled thereto and it was not until the hearing on May 6, 1941, that officers of the defendant received knowledge through testimony given by various employees that they claimed to have worked more overtime than was shown on their time cards. At no time have any of the employees made any claim upon the defendant for payment for overtime worked, nor has any employee, with one exception, kept a record of the actual overtime he claims to have worked, from which any computation could be made of an amount due him therefor. The exception is Claud Casto, a former employee of defendant, who kept a private record which he exhibited at the hearing and which showed substantially more overtime than he had listed on his time card, but even this former employee has made no claim against defendant for additional overtime, although invited by letter from the defendant sent to him on April 30, 1941, in connection with the payment of deficiencies as shown by the audit, to advise defendant if such payment was incorrect.

A full hearing was had on May 6, 1941, and the case is now presented for decision upon briefs filed by counsel for plaintiff and defendant.

The question to be decided is whether or not, in view of the foregoing facts, the plaintiff is entitled to an injunction against the defendant restraining the defendant from future violations of the Fair Labor Standards Act of 1938. The decision of this question must depend on whether or not there is reasonable cause for apprehending that defendant may in the future resume a course of conduct in violation of the act. The purpose of an injunction is to deter a defendant from engaging in the prohibited acts and not to punish him for past conduct. It is, of course, not necessary that irreparable injury be apprehended, since the proceeding is one for a statutory injunction. United States v. San Francisco, 310 U.S. 16, 30, 60 S.Ct. 749, 84 L.Ed. 1050. But it by no means follows that the plaintiff is entitled to an injunction merely upon a showing of past violations. The act provides that: "The district courts of the United States * * * shall have jurisdiction, for cause shown, * * * to restrain violations of section 215." 29 U. S.C.A. § 217. I do not interpret this statute to mean that the Court should automatically issue an injunction in all cases where violations of the statute are shown or admitted. Each case must be measured and decided according to its own circumstances.

Counsel for the plaintiff cite numerous cases in which injunction was issued even though the defendant ceased his violations when the suit was instituted and professed an intention to abide by the law in the future. In virtually all of the cases cited to sustain the argument that an injunction should issue, the facts show that the defendant either denied the alleged violations or challenged the constitutionality or applicability of the law, so that a justiciable

controversy was presented which called for judicial determination. Thus, in the case of Fleming v. Tidewater Optical Company, D.C.E.D.Va., 35 F.Supp. 1015, the defendant contended that the Fair Labor Standards Act of 1938 was unconstitutional and that its business did not come within the purview of the act. Furthermore, the professions of the defendant in that case of its intention to abide by the law in the future were negatived by the fact that it made no effort and showed no desire to make any adjustment of amounts claimed as payments for overtime. In the case of United States v. Trans-Missouri Freight Association, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007, the question of the illegality of the association was involved, which question had been decided by the lower court in favor of the defendant, and the appellate court held the point should be decided and reversed the lower court, notwithstanding the dissolution of the association pending appeal. In the case of Securities and Exchange Commission v. Torr, D.C., 22 F.Supp. 602, the decision is placed on the ground that the defendants were still engaged in unlawful practices when the commission instituted its suit. While it is contended by counsel for the plaintiff in the instant case that the same situation existed here, namely, that the defendant bank continued to violate the provisions of the Act until after suit was brought, I do not so interpret the testimony. The defendant installed its time clock for the purpose of keeping accurate records more than a month before the suit was brought and while at the time of the institution of the suit there were unpaid wages due for overtime, yet such arrearages had not been called to defendant's attention and were paid promptly when so brought to light.

I find no case in which the Circuit Court of Appeals of this circuit has decided the precise question which is presented here. The case nearest in point in this circuit is that of Fleming v. Phipps, 35 F.Supp. 627, from the District Court of Maryland, in which Judge Chesnut in a well reasoned opinion denied an injunction where violations had ceased a considerable time before institution of the suit and there was no likelihood of repetition thereof.

The defendant is an old and established banking institution. The issuance of an injunction against it with the publicity certain to ensue could not fail to have a substantially harmful effect upon its relations with the public and upon public confidence in it as a banking institution. Therefore such injunction should not issue, except upon clear and convincing proof that it is necessary in the public interest.

I am of opinion from the facts of this case that the defendant did not knowingly and wilfully violate the provisions of the Fair Labor Standards Act of 1938; that it ceased its violations a considerable time before this suit was instituted; and that there is no reasonable ground to apprehend that it may violate the act in the future.

Injunction is therefore denied and the complaint dismissed.

An order may be entered in accordance with this opinion.